UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | No. | 23 CV 50312 |
| v. | ) | | (19 CR 50016) |
| | ) | | |
| FLOYD BROWN | ) | | Judge Matthew F. Kennelly |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S § 2255 MOTION**

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, respectfully responds to defendant FLOYD BROWN's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.

## I.    BACKGROUND

### A.  Offense Conduct

On March 7, 2019, defendant, who was hiding from law enforcement with his girlfriend in a hotel room in Rockford, Illinois, repeatedly discharged a firearm through the room's door and wall at three law enforcement officers he knew were on the other side.  He then shot and killed Jacob Keltner, another law enforcement officer, who was in the parking lot.  The law enforcement officers were United States Deputy Marshals and Special Deputy United States Marshals (collectively "Deputy Marshals") attempting to arrest defendant pursuant to a lawful arrest warrant issued by a state court judge.

1

### B.  The Investigation

The following factual background is taken from the government's response to defendant's motion for a *Franks* hearing, CrR. 186, which defendant recited and adopted in large part in his § 2255 petition. R.1 at 14-21.[1]

#### 1.  *The State's Arrest Warrants*

In December 2018, the Bloomington Police Department ("BPD") was investigating a string of residential burglaries in Bloomington and other cities in central Illinois, and had identified defendant as their primary suspect. At the time, defendant was on parole as a result of multiple prior state convictions for residential burglary. On December 23, 2018, BPD officers attempted to catch defendant in the midst of another burglary. When officers approached to arrest him, however, defendant quickly got into his vehicle and sped away. He crashed into another vehicle a short time later, and fled on foot before officers arrived, eluding arrest.

On or about December 26, 2018, a McLean County Circuit Court judge issued an arrest warrant for defendant based on charges for three residential burglaries. Five days later, the Illinois Department of Corrections ("IDOC") also issued an arrest warrant for defendant for violating the terms of his parole. The IDOC parole violation report in support of the warrant explained that defendant's whereabouts were unknown.

Within about a week after the arrest warrants for defendant were issued, Deputy Marshals with the Great Lakes Regional Fugitive Task Force (hereafter "Task Force") joined in the effort to locate and arrest defendant. As part of their investigation, in January 2019, Deputy Marshals

---

[1] Citations to the electronic record in this matter (23 CV 50312) are designated as "R." followed by the document number. Citations to the electronic record in defendant's underlying criminal case (19 CR 50016) are designated as "CrR." followed by the document number.

interviewed Individual A, who was a former girlfriend, close associate, and suspected coconspirator of defendant, about defendant's whereabouts. Individual A reported that she was no longer seeing defendant and that defendant had a new girlfriend, whom she identified as "Dri." Individual A also identified for the officers a Facebook profile being used by "Dri," and told them that the defendant likely was with "Dri." Subsequently, a Deputy Marshal identified "Dri" as Drianna Wright, based on a comparison of known photographs of Wright with photographs posted on "Dri's" Facebook account.

In early January 2019, Deputy Marshals searched for defendant at defendant's son's residence, with no success. While at the residence, they questioned defendant's son and the son's girlfriend about defendant's whereabouts. Defendant's son advised that defendant and Wright had previously been staying with him and his girlfriend, but that defendant and Wright had not been there in weeks. Defendant's son denied knowing defendant's current whereabouts.

On or about January 18, 2019, a Deputy Marshal received information from Amtrak indicating that Wright had booked a bus trip from Rockford to Chicago, followed by a train trip from Chicago to Springfield, on January 17, 2019, with a return trip booked for January 18, 2019, but that Wright had not boarded the bus or train. Amtrak provided the email address and phone number used for the booking. The phone number was 314-xxx-9123 (the "-9123 phone").

### 2. The 2/5/2019 Historical Cellsite Warrant for the -9123 Phone

On February 5, 2019, a BPD Detective submitted a complaint for a search warrant to obtain historical call, text, and data detail records and historical location information for the -9123 phone. A McClean County Circuit Court judge issued the warrant on February 5, 2019. The BPD Detective served the warrant on the service provider later that day.

On March 1, 2019, BPD received documents from the service provider in response to the warrant. The documents reflected the -9123 phone's use from approximately December 29, 2018 through February 4, 2019. BPD forwarded the records to Deputy Marshals working on the fugitive investigation of defendant, and to a BPD Crime and Intelligence Analysis Unit Supervisor, who was working on analyzing phone records and other intelligence as part of the burglary investigations.

The BPD Crime and Intelligence Analysis Unit Supervisor ("BPD Supervisor") immediately began analyzing the information. In analyzing the historical cell site location information ("CSLI"), the BPD Supervisor noticed that the -9123 phone had been using cell towers located on the east side of Rockford, and that the call records showed that the -9123 phone had contacted a bus company, Amtrak, and multiple Rockford-area businesses, including a Walmart store, AMC Theater, and UPS Store. The BPD Supervisor's analysis also showed that the -9123 phone had made two calls to the 800-number for the hotel brand Extended Stay America in January 2019—and no other hotels.  The BPD Supervisor also noted that an Extended Stay hotel was located in Rockford near the I-90 "clover leaf" on the east side of Rockford. The phone records also showed that the  -9123 phone number was in contact with multiple phone numbers having a 217 area code, which covers the Springfield area and other parts of central Illinois. The BPD Supervisor sent his analysis to the BPD Detective and to a Deputy Marshal on March 4, 2019 and discussed his findings with them on the same day.

### 3.   *The 3/4/2019 Historical and Prospective Cellsite Warrant for -9123 Phone*

On March 4, 2019, a Deputy Marshal submitted to a McLean County Circuit Court judge an application for a warrant authorizing the installation, use, and monitoring of a pen register and trap and trace device and the obtaining of historical and prospective location information for

the -9123 phone. A McLean County Circuit Court judge issued the requested warrant on March 4, 2019 ("the March 4, 2019 Warrant"). The warrant was served on the service provider on March 5, 2019, and the Deputy Marshals began receiving real-time location information and pen register and trap and trace data for the -9123 phone beginning around 7:00 p.m. on March 5, 2019.

The prospective location data ("pings") for the -9123 phone were consistent with the historical CSLI for the -9123 phone obtained through the previous warrant and, like the previous historical location information, showed that the -9123 phone was located on the east side of Rockford near the I-90 interchange. The "meter radius" for the pings received between March 5 and March 7, 2019, ranged from approximately 0.8 miles to over 1.5 miles. The BPD Supervisor advised the Deputy Marshal that the new information for the -9123 phone was consistent with the historical CSLI and call records previously received for the -9123 phone.

On March 6, 2019, a lead was assigned to a Deputy U.S. Marshal. Based on the location information for the -9123 phone and the -9123 phone's contacts with the 800-number for Extended Stay, the Deputy Marshal and his team planned to go to the Extended Stay hotel on the morning of March 7, 2019—assuming that overnight ping data did not point in another direction. They arranged for other Deputy Marshals in Rockford to meet them in Rockford to assist in locating defendant.

### 4. *The Day of the Murder*

On the morning of March 7, 2019, the Deputy Marshals received an updated analysis of the pings for the -9123 phone, which showed that the -9123 phone was still in the area of the I-90 interchange in Rockford. Accordingly, they headed to Rockford, and began their search for defendant at the Extended Stay America hotel in the area.

One of the Deputy Marshals spoke with the hotel's general manager at the hotel's front desk. Shown photographs of defendant's girlfriend, Drianna Wright, the general manager immediately recognized her as a guest staying in Room 305, and stated that Wright had come to the front desk a few minutes earlier to pay for an additional week. The hotel's maintenance engineer who joined the conversation also immediately recognized Wright as a guest staying in Room 305. The Deputy Marshal learned from the general manager and maintenance engineer that Wright had been staying at the hotel since December 2018, and that a male was staying with her. Among other things, the maintenance engineer described a vehicle belonging to Wright and the male, and identified where the vehicle typically was parked in the hotel's parking lot.

The maintenance engineer agreed to conduct a ruse visit to Room 305 to determine whether the male was in the room at the time. As part of the ruse visit, the maintenance engineer knocked on the door to Room 305. Wright answered the door, and the maintenance engineer advised her that there was a leak in a neighboring room and he wanted to check her kitchen area for a possible leak. Wright allowed the maintenance engineer inside the room, and he briefly checked the kitchen area. While the maintenance engineer was in the room, he observed that a male was lying on the bed sleeping. On his way back to the lobby area, the maintenance engineer sent a text to the Deputy Marshal confirming the male was in the room.

While maintaining visual surveillance of the hallway and setting up exterior surveillance positions around the hotel, the Deputy Marshals prepared to enter Room 305 and arrest defendant. Three Deputy Marshals approached the door to Room 305 with a battering ram; they knocked, announced themselves as U.S. Marshals looking for Floyd Brown, stated that they had a warrant for Brown's arrest, and directed the occupants to open the door.

The Deputy Marshals heard commotion inside the room and a female voice approaching the door. They also heard a male voice from deep in the room yelling "Don't do it" repeatedly. A Deputy Marshal used the master key to unlock the door, but the door did not fully open because the swing lock was engaged. Wright attempted to pull the door open from inside the room while yelling that she wanted to get out of the room. The male in the room continued to yell, "Don't do it."

Shortly before 9:15 a.m., defendant shot at the officers from inside the room, spraying bullets through the door and wall of Room 305 into the hallway. The three Deputy Marshals in the hallway took cover in the stairwell and elevator bank and did not return fire.

Defendant jumped out of the hotel room window and then shot and killed Deputy Marshal Keltner, who had been occupying an exterior surveillance position near the hotel's northeast side between Room 305 and defendant's vehicle. Defendant then fled the area in his vehicle.

At approximately 10:58 a.m., two Illinois State Police troopers spotted defendant traveling south on I-39 just north of Bloomington. After a high-speed chase along county and local roads and then onto the I-55 expressway, during which defendant's vehicle reached speeds of about 124 mph and side-swiped other vehicles, law enforcement officers forced defendant's vehicle off the road into a field. Defendant attempted to drive through the field but ultimately crashed into a culvert, disabling his vehicle. During a stand-off lasting several hours, law enforcement officers deployed tear gas near defendant's vehicle. Defendant eventually exited the vehicle and was taken into custody.

At approximately 6:20 p.m. on March 7, 2019, a magistrate judge issued a federal warrant to search Rooms 305, 306, and 307 and common areas of the Extended Stay hotel. Evidence recovered during the search of Room 305 included two loaded handguns with obliterated serial

numbers, several loaded firearm magazines, hundreds of rounds of ammunition, a ballistic vest, and three electronic devices, namely, defendant's cell phone, computer, and PlayStation console. Investigating agents subsequently recovered additional evidence relating to, among other things, defendant's knowledge, intent, planning and premeditation, and possession of the weapons, in a search of the three electronic devices pursuant to warrants. Additionally, the search of the cell phone recovered from Room 305 revealed that the cell phone was assigned the -9123 phone number.

On March 8, 2019, a United States District Court Judge for the Central District of Illinois issued a warrant to search defendant's vehicle. During agents' execution of this warrant, investigating agents recovered two rifles with obliterated serial numbers, one of which was later connected to spent shell casings found at the Extended Stay hotel, and nearly 1,000 rounds of additional ammunition.

### C. Federal Prosecution

#### 1. Charges

A federal grand jury returned a superseding indictment that charged defendant with first degree murder, in violation of 18 U.S.C. § 1114(1) and 1111 (Count One); attempt murder, in violation of 18 U.S.C. § 1114(3) and 1113 (Count Two); assault of a federal officer, in violation of 18 U.S.C. § 111(a)(1) and (b) (Counts Three and Four); felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Five); possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. § 922(k) (Count Six), discharge of a firearm during and in relation to a crime of violence that caused death, in violation of 18 U.S.C. § 924(j)(1) (Count Seven); and discharge of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (iii) (Count Eight). CrR. 144.

### 2. *Denial of Defendant's Motion for a Franks Hearing*

Defendant filed several pre-trial motions, including a motion for a *Franks* hearing challenging the March 4, 2019, Warrant authorizing the installation, use, and monitoring of a pen register and trap and trace device and the obtaining of historical and prospective location information for the -9123 phone. CrR.175. In the motion, defendant argued that the warrant application contained certain material false statements. CrR. 175. The government responded on July 13, 2021, arguing (1) the collection of limited real-time location information for the -9123 phone did not constitute a search implicating the fourth amendment; (2) no challenge to the March 4, 2019, Warrant could support the exclusion of evidence recovered from defendant's hotel or vehicle because defendant's new crimes severed any casual connection between the challenged warrant and subsequent events and because, even absent the challenged pings, defendant inevitably would have been located at the Extended Stay hotel; and (3) defendant had failed to make a preliminary showing that the affidavit contained materially false statements or that the affiant acted intentionally or recklessly to deceive the court, as required to warrant a *Franks* hearing. CrR.186. The defendant replied on July 30, 2021. CrR. 194.

The Court denied defendant's motion for a *Franks* hearing during a hearing on August 6, 2021. CrR. 195. The court addressed each of the alleged material false statements and found that the defendant failed to make a preliminary showing that any of the statements were materially false or that the affiant acted intentionally or recklessly in making the statements. R. 195, August 6, 2021 Tr. at 3-6 (attached as Exhibit A). The court then ruled,

> Moving on, even if what I said is wrong, the Seventh Circuit has held in a case called Hammond, that collection of realtime [cellsite] location information for a short period doesn't constitute a search that implicates the Fourth Amendment. In this case, the information was collected for less than two days and no exact locations were obtained. It was basically a range of a little over three quarters of a mile to a mile and a half. Mr. Brown was a fugitive at the time and he arguably had even further reduced expectation of

privacy. Even if what I said about the absence of a preliminary showing of falsity is incorrect, the Fourth Amendment isn't indicated here and therefore Franks v. Delaware wouldn't be applicable.

Finally, the government is also correct in my view that the alleged commission of a new offense, specifically the shooting on March the 7th, was an intervening circumstance that dissipates any prior taint of illegality, assuming there was one. That comes from a case called Sprinkle that was cited by the government.

Exhibit A at 6-7.

On August 30, 2021, two of defendant's attorneys moved to withdraw from the case. CrR. 201 and 202. Both motions were granted after a hearing. CrR. 205.

### 3. *Trial and Sentencing*

A jury trial began on March 28, 2022. CrR. 278. The government did not elicit any information about the cellsite location during trial. The jury returned verdicts finding defendant guilty of second-degree murder on Count One and guilty as to all other counts as charged in the superseding indictment. CrR. 287.

On August 29, 2022, after denying defendant's motion for a new trial, CrR. 309, the court sentenced defendant to a total term of 55 years' imprisonment, and issued the Judgment of Conviction on September 6, 2022. CrR. 327. Defendant did not appeal his conviction or sentence.

### 4. *Defendant's § 2255 Motion*

On or about August 28, 2023, defendant timely filed a motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. R.1. In the motion, defendant argues that he received ineffective assistance of counsel because his attorney failed to file a motion to suppress the evidence resulting from what he alleges was a warrantless tracking of the -9123 phone prior to, and on or after March 4, 2019. R.1.[2]

---

[2] In his § 2255 Petition, defendant cited two grounds for relief: (1) that he was denied effective assistance of counsel, and (2) that his attorney failed to file a suppression motion. The supporting facts for each ground and the combined legal argument section makes it clear that the defendant is arguing ineffective

## II.     LEGAL STANDARD

Under 28 U.S.C. § 2255, a court may grant relief from a federal sentence if the sentence was imposed "in violation of the Constitution or laws of the United States," in excess of the statutory maximum penalty, or by a court lacking jurisdiction, among other reasons. 28 U.S.C. § 2255(a).  "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States,* 476 F.3d 518, 521 (7th Cir. 2007). As a result, relief is appropriate only where an error is of constitutional or jurisdictional magnitude or "where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States,* 723 F.3d 870, 878-79 (7th Cir. 2013).

Defendant is permitted to raise an ineffective-assistance-of-counsel claim in a collateral proceeding, even though defendant could have, but did not raise claim on direct appeal.  *Massaro v. United States*, 538 U.S. 500, 504 (2003).

To establish a claim of ineffective assistance of counsel, defendant must prove (1) that his counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington,* 466 U.S. 668, 687-88 (1984). "Failing to prove either" prong of Strickland's test "defeats a petitioner's claim." *Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) (quotation omitted).  To show prejudice, defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. When the claim of ineffective assistance is based on counsel's failure to

---

assistance of counsel *because* his attorney failed to file a suppression motion.  As such, the government will respond to the single claim of ineffective assistance of counsel.

present a motion to suppress, courts have required that a defendant prove the motion was meritorious. *Owens v. United States*, 387 F.3d 607, 610 (7th Cir. 2004); *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004). *See also Hicks v. Hepp*, 871 F.3d 513, 526 (7th Cir. 2017) ("To successfully advance a claim of ineffective assistance of counsel based upon the failure to file a motion to suppress, a petitioner must demonstrate ... a reasonable probability that, if [the challenged evidence] were suppressed, he would have been acquitted." (quotation omitted)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If an attorney's decision was sound at the time it was made, the decision cannot support a claim of ineffective assistance of counsel. *Winters v. Miller*, 274 F.3d 1161, 1166 (7th Cir. 2001).

### III.   ARGUMENT

Defendant falls far short of showing that his attorneys' representation fell below an objective standard of reasonableness and that the deficient performance prejudiced the outcome of the proceeding.  Defense counsels' failure to file a suppression motion challenging the purportedly warrantless search of the -9123 phone was reasonable because the limited real-time location information for the -9123 phone was in fact collected pursuant to a warrant. None of the documents defendant offers in support of this argument demonstrate the non-existence of the warrant or provide any other basis for concluding that a motion to suppress would have been meritorious. Defendant also cannot prove prejudice as the court had previously found that (1) the collection of limited real-time location information for the -9123 phone did not constitute a search implicating the fourth amendment, and (2) defendant's new crimes severed any casual connection between the challenged warrant and subsequent events. Moreover, even absent the challenged pings, defendant inevitably would have been located at the Extended Stay Hotel in Rockford.

**A. Defense Counsel's Refusal to File a Suppression Motion Alleging Warrantless Search of -9123 Phone Was Reasonable**

Defense counsels' decision to seek a *Franks* hearing to challenge the March 4, 2019, Warrant rather than arguing that the warrant did not exist was a reasonable, strategic decision. First and foremost, as defense counsel was aware, the limited real-time location information for the -9123 phone was in fact collected pursuant to a warrant. Indeed, defense counsel attached a copy of the warrant defendant now says did not exist as an exhibit to his *Franks* motion. *See* CrR. 175, Exhibit A. The March 4, 2019, Warrant was signed by a McLean County Circuit Court Judge, and ordered the service provider to furnish law enforcement officers for a period of sixty days prior continuing through sixty days from the date of the order, certain telecommunications and other records and assistance for the -9123 phone, including the following:

> Based on probable cause, twenty-four hour a day assistance to include switch based solutions including precision location based information queries, per-call measurement-data (PCMD), range-to-tower (RTT), Network Event Location System/NELOS, GPS/E911, and *all reasonable assistance to permit the aforementioned agencies to triangulate the historic, current, and ongoing/prospective/real-time location of the target telephone*, including but not limited to, terminating interfering service on the target telephone.

CrR. 175, Exhibit A (Emphasis added).

Defendant now argues that his attorney should have nevertheless filed a suppression motion because it "would have brought questions" about March 4, 2019, Warrant. R.1 at 22. Defendant's argument, however, falls far short of the requisite standard of proving that his motion would have been meritorious. His claim that the warrant did not exist appears to rest solely on a series of emails among Deputy Marshals, including one specific email from the affiant who submitted the application for the March 4, 2019, Warrant. R.1 at 22; Exhibit G. The email, written by the affiant to another Deputy Marshal on March 5, 2019, read,

13

Attached is a phone number that Drianna Wright gave to AMTRAK. There are several calls that makes me believe that she is using this phone. Can we go up on it?

R.1 at Exhibit G.

Defendant speculates that the Affiant's question "Can we go up on it?" meant "[C]an they get an order to track the -9123 phone." R.1 at 18. He questions why the affiant would make such a request if he had already obtained the warrant, and incorrectly concludes that the warrant must not have existed. R.1 at 22. He ignores other, more logical explanations about the meaning of the email, such as the Affiant seeking supervisor approval to utilize USMS resources to *execute* the signed order. Defendant's counsels possessed a report of interview that explained the meaning of this email. The report, attached to their motion for a *Franks* hearing, reads, "[f]ollowing the signing of the phone order for Target phone 2, [the affiant] emailed [his supervisor] requesting authority to begin monitoring location information for Target Phone 2." R. 195, Exhibit D at 3-4. With this information, it was not unreasonable for defense counsel to refuse to present these emails in support of a challenge to the existence of the March 4, 2019, Warrant. Therefore, the instant claim must fail.

Defendant alternatively argues that, even if the March 4, 2019, Warrant existed and was valid, his attorney should have moved to suppress the CSLI obtained prior to the judicial authorization of the March 4, 2019, Warrant. R.1 at Exhibits A-C. Defendant again falls far short of showing that such a motion would have been meritorious. The CSLI data that defendant attached to his § 2255 petition was from March 6th and March 7th, after the March 4, 2019, Warrant was executed. The government is unaware of any CSLI obtained prior to the March 4, 2019, Warrant, other than the historical CSLI obtained with the February 5, 2019, Warrant, and defendant identified no other data. In any event, the March 4, 2019, Warrant plainly authorized the collection of, not only the current and ongoing/prospective/real-time location of the target

14

telephone for sixty days beginning on March 4, 2019, but also the historical CSLI of the target phone for a period of sixty days *prior to* March 4, 2019. CrR. 175 at Exhibit A. Therefore, even if the government were in possession of CSLI for the -9123 phone predating March 4, 2019, it would have been obtained through a judicially authorized warrant and not, as defendant claims, through a warrantless search. Defendant has not established that a motion to suppress would have even the slightest merit.

### B. Counsel's Failure to File a Suppression Motion Alleging Warrantless Search of -9123 Phone Did Not Prejudice the Outcome of the Proceeding

The defendant also cannot establish that he would have prevailed if his attorney had filed a suppression motion, or that the outcome of the trial would have been any different. The court had already denied defendant's pre-trial motion for a *Franks* hearing involving the same warrant he now argues did not exist. The court credited the government's arguments and, relevant to defendant's instant claim, found that (1) defendant had not established that he had a legitimate expectation of privacy in the phone location information obtained pursuant to the challenged warrant; and (2) even if defendant established a legitimate expectation of privacy, the attenuation doctrine precluded suppression of the challenged evidence. These findings would apply equally to a motion to suppress, and proves that, even if his attorney filed the suppression motion as he now argues the attorney should have, the motion would have been denied. Additionally, although the court previously found it unnecessary to resolve this issue in the context of the defendant's *Franks* motion, the evidence that defendant now seeks to suppress would have been inevitably discovered by law enforcement even without the CSLI.

Finally, arguments made by the government in response to defendant's *Franks* motion, R.186, apply equally here and therefore are re-presented below.

15

### 1. The Collection of Limited Real-Time Location Information for the -9123 Phone Did Not Constitute a Search Implicating the Fourth Amendment.

"The application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *United States v. Knotts*, 460 U.S. 276, 280 (1983) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). This inquiry involves a two-prong analysis. First, courts must consider "whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy . . . ." *Id*. at 281. Second, courts must consider "whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Id*. Defendant bears the burden of establishing both prongs of this analysis, which must be satisfied as a threshold matter in order for defendant to seek to suppress evidence on Fourth Amendment grounds. *See United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014).

Defendant has failed to establish that the real-time location information of the -9123 phone was the product of an unconstitutional search. Absent a constitutionally protected search, the government's conduct may not be challenged on Fourth Amendment grounds.

The Seventh Circuit's opinion in *United States v. Hammond*, 996 F.3d 374 (7th Cir. 2021), is instructive. In *Hammond*, law enforcement officers had been investigating a string of armed robberies in northern Indiana and southern Michigan. *Id*. at 380. They identified Hammond as their prime suspect and developed probable cause to arrest him. *Id*. at 380-81. Pursuant to a request based on exigent circumstances, officers obtained real-time CSLI for Hammond's cell phone and began using the CSLI to attempt to locate and arrest Hammond. *Id*. at 381. Officers tracked the CSLI for Hammond's phone for about six hours until they observed Hammond leaving a hotel parking lot in his vehicle. *Id*. at 381, 389. They then began physical surveillance of Hammond and eventually pulled him over for committing a traffic violation. *Id*. Hammond and the passenger in

16

his vehicle made admissions following the stop, and officers recovered a gun, ammunition, and other evidence from Hammond's vehicle. *Id*. at 382.

Hammond later moved to suppress the statements and evidence. The district court denied Hammond's motion, and the Seventh Circuit affirmed, holding, as pertinent here, that the officers' collection of real-time CSLI was not a search. The Seventh Circuit explained that the Supreme Court's opinion in *Carpenter v. United States*, --- U.S. ----, 138 S. Ct. 2206 (2018), addressed only historical CSLI, and not real-time data, and concluded that *Carpenter* did not disturb the Supreme Court's prior holding in *Knotts* that law enforcement officers did not conduct a "search" when they attached a beeper to a drum of chloroform and tracked the drum's (and thereby the defendant's) movements from one state to another. *Id*. at 387-89.

The Seventh Circuit determined that the collection of real-time CSLI for a short period of time, as in *Hammond*, is more akin to the facts in *Knotts* than those in *Carpenter* for multiple reasons. First, in *Carpenter*, investigators collected 127 days of historical CSLI for the defendant's phone, whereas in *Knotts* and *Hammond*, investigators tracked the defendant's location for a matter of hours only. Second, the Supreme Court's opinion in *Carpenter* expressed particular concern with the "retrospective quality" of historical location data, which gave police "access to a category of information otherwise unknowable." *Id*. at 389 (*quoting Carpenter*, 138 S. Ct. at 2218). The Seventh Circuit found that the real-time location tracking at issue in *Knotts* and *Hammond* did not involve the same level of intrusion and was more similar to traditional government surveillance capabilities of which society is well aware. *Id*. at 390. Finally, the Seventh Circuit explained that officers in *Hammond* used the real-time tracking information "to find Hammond's location in public, not to peer into the intricacies of his private life." *Id*. at 389 (also noting that Hammond did not argue that he was in "a home or other highly protected area" during the tracking time period).

17

Considering these facts in their totality, the Seventh Circuit ultimately concluded that officers' brief tracking of real-time CSLI for Hammond's phone, to find and arrest Hammond, did not constitute a Fourth Amendment search because any purported, subjective expectation of privacy Hammond had under the circumstances was "not one that society is prepared to recognize as reasonable." *Id*. at 392 (internal quotation marks omitted; *quoting Katz*, 389 U.S. at 361).

As in *Hammond*, the collection of real-time location data for defendant's phone over a short period of time was not a constitutionally protected search. Officers received real-time location information for the -9123 phone for approximately 38 hours: from around 7:00 p.m. on March 5, 2019, until the morning of March 7, 2019. The pings provided only an approximate location radius, ranging from approximately .8 miles to over 1.5 miles, not an exact location, meaning that the pings were not precise enough to reveal defendant's movement in private spaces. *See United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) ("[U]sing seven hours of GPS location data to determine an individual's location (or a cell phone's location) so long as the tracking does not reveal movements within the home (or hotel room), does not cross the sacred threshold of the home, and thus cannot amount to a Fourth Amendment search."). And, as in *Hammond*, officers used the pings solely to find defendant and arrest him on outstanding warrants, not to develop probable cause of a criminal offense or to "peer into the intricacies of his private life." *Hammond*, 996 F.3d at 389.

Indeed, the circumstances of this case are nearly identical to the circumstances in *United States v. Riley*—relied on by the Seventh Circuit in *Hammond*, *id*. at 391—in which the Sixth Circuit determined that using seven hours of GPS location data to find and arrest a fugitive was not a Fourth Amendment search. In *Riley*, an arrest warrant had been issued for the defendant, and the U.S. Marshals obtained an order authorizing them to track the defendant's cell phone in real

time. The real-time GPS location information obtained pursuant to the order indicated that the defendant was staying at the Airport Inn in Memphis. U.S. Marshals went to the motel and showed the front-desk clerk a photograph of the defendant. The clerk identified the defendant's room number, and the U.S. Marshals knocked on that room door and arrested the defendant when he answered. The Sixth Circuit held that the tracking of the defendant's cell phone's real-time GPS coordinates did not constitute a search for reasons including that "the government learned no more about [his] whereabouts from tracking his cell-phone GPS data than what [he] exposed to public view by traveling to the motel lobby 'along public thoroughfares'—even if [defendant] meant to keep his location a secret, one cannot expect privacy in one's public movements. " *Riley*, 858 F.3d at 1018 (emphasis in original) (*quoting United States v. Skinner*, 690 F.3d 772, 774 (6th Cir. 2012)).

Here, as in *Riley*, the various investigative leads, including historical cell-site data, call detail records, and pings, led the Deputy Marshals to a general, public area—the lobby of the Extended Stay hotel—where they continued their search for defendant by interviewing hotel staff. Interviews of the hotel staff—not the pings—then led the Deputy Marshals to the specific room where defendant and Wright were staying. Indeed, the location data for the -9123 phone was not precise enough to confirm that defendant was at any specific hotel, much less in a specific room within a hotel. In other words, just as investigators in *Hammond* used real-time CSLI to identify a general location but relied on physical surveillance in a public area to find the defendant, the Deputy Marshals here used the real-time data (coupled with other investigative leads) to locate a general area where Wright and defendant were staying and then relied on traditional investigative techniques—call detail (non-location) records, witness interviews, and a ruse visit—to find defendant's private room.

In addition, because defendant was an "AWOL" parolee for whom multiple warrants had been issued, and a fugitive who was actively evading law enforcement after fleeing from an attempted arrest, he had a minimal reasonable expectation of privacy, if any, in his whereabouts. *See Payton v. New York*, 445 U.S. 573 (1980); *United States v. Patrick*, 842 F.3d 540, 545 (7th Cir. 2016) ("A fugitive cannot be picky about how he is run to ground[,]" whether it be by "paid informant, a jilted lover, police with binoculars, a bartender, a member of a rival gang, a spy trailing his car after it left his driveway, the phone company's cell towers, or a device pretending to be a cell tower"); *Riley*, 858 F.3d at 1019 (Boggs, J., concurring) ("Surely, if the issuance of a valid arrest warrant may reasonably require an individual to open the doors of his home, which stands at the 'very core' of Fourth Amendment protection . . . then it may reasonably require the same individual to open the doors of his phone—at least so far as to disclose the longitude and latitude coordinates emitted by a phone that the individual chooses to carry and turn on." ); *United States v. White*, 781 F.3d 858, 862 (7th Cir. 2015) (parolees have substantially diminished expectations of privacy, and those expectations may be further diminished by the applicable conditions of parole).  And the government had a strong legitimate interest in locating defendant to effectuate an arrest.

The totality of the circumstances, therefore, show that the Deputy Marshals could have obtained location information for defendant's cell phone without a warrant, and thus their search of these records does not implicate the Fourth Amendment in any way—notwithstanding that the government actually did seek and obtain a warrant. *Cf. White*, 781 F.3d at 862-63; *Patrick*, 842 F.3d at 542-45; *Riley*, 858 F.3d at 1019-23 (Boggs, J., concurring).

In sum, because the collection of the data obtained by the March 4, 2019, Warrant did not violate any reasonable expectation of privacy of defendant, the Fourth Amendment is not implicated, and any suppression motion to the contrary would have been denied.

### 2. No Challenge to the March 4, 2019, Warrant Could Support the Exclusion of Evidence Recovered from Defendant's Hotel or Vehicle.

The government did not introduce the real-time location data obtained with the challenged search warrant at a trial. Accordingly, the only evidentiary question posed by defendant's ineffective assistance of counsel claim is whether there were fruits of the search that could have been suppressed on motion of the defendant. To any extent that defendant is arguing that a motion to suppress the CSLI would have resulted in suppression of all evidence recovered from the Extended Stay hotel and defendant's vehicle as "fruit of the poisonous tree," this argument is undeveloped and thus waived. *See United States v. Davis*, 29 F.4th 380, 385 n.2 (7th Cir. 2022). Even if not waived, the argument lacks any merit.

The Supreme Court has long rejected a "but for" test in evaluating the fruits of governmental conduct. *United States v. Liss*, 103 F.3d 617, 620 (7th Cir. 1997) (*citing Wong Sun v. United States*, 371 U.S. 471, 487-83 (1963)). Because the exclusionary rule is one of "last resort, not . . . first impulse," *Utah v. Strieff*, 579 U.S. 232, 238, 136 S. Ct. 2056, 2061 (2016) (citation omitted), the "more apt question" is whether the challenged evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint," *Wong Sun*, 371 U.S. at 487 88.

Here, the exclusionary rule has no role to play—and would have no role to play even if agents had acted improperly in obtaining the March 4, 2019, Warrant—because there were no tainted fruits of that warrant. Defendant's commission of new crimes was an intervening circumstance that severed any causal connection between the challenged warrant and the

subsequent events. In addition, even absent the data obtained by warrant, officers inevitably would have found defendant at the Extended Stay hotel. Thus, suppression would have been unwarranted.

**a.** ***Defendant's New Crimes Severed Any Casual Connection Between the Challenged Warrant and Subsequent Events***

Under the attenuation doctrine, "[e]vidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 136 S. Ct. at 2061. Three factors guide this analysis: (1) the "temporal proximity" between the unconstitutional conduct and the discovery of the challenged evidence; (2) the presence of "intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct." *Id*. at 2061-62.

Although the real-time location data obtained pursuant to the March 4, 2019, Warrant was received close in time to the events of March 7, 2019, defendant's murder of Deputy Keltner, his assault and attempted murder of the Deputy Marshals in the hotel, his shooting of Wright, and the high-speed chase on which he led law enforcement agents, endangering their lives and the lives of innocent bystanders, were intervening circumstances that severed any casual connection between the challenged warrant and all evidence recovered thereafter, including that recovered from the Extended Stay hotel and defendant's vehicle.

Courts overwhelmingly have held that a defendant's shooting at officers, assault of officers, and flight that endangers public safety constitute intervening circumstances that dissipates the taint of any prior illegality. *See, e.g.*, *United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997) (collecting cases) (reversing district court's suppression of firearm where, although the initial stop was illegal, defendant's firing of a gun at an officer constituted an intervening

circumstance); *United States v. Bailey*, 691 F.2d 1009, 1019 (11th Cir. 1982) (defendant's flight and striking of an officer in an effort to escape was an intervening circumstance dissipating taint from initial illegal arrest); *United States v. King*, 724 F.2d 253, 256 (1st Cir. 1984) (shooting at officers "was an independent intervening act which purged the taint of the prior illegality"). *See also Strieff*, 136 S. Ct. at 2063 (holding that discovery of an "outstanding warrant for [the defendant's] arrest is a critical intervening circumstance that is wholly independent of the illegal stop . . . . [that] broke the causal chain between the unconstitutional stop and the discovery of evidence . . . .").

"A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Sprinkle*, 106 F.3d at 619 (quoting *Bailey*). It would be startling to suggest that defendant should be effectively immunized for murder, attempted murder, and assault of the Deputy Marshals because of a purported illegality that did nothing more than assist officers in finding defendant in order to arrest him on outstanding warrants. And the exclusionary rule requires no such result. *See United States v. Martin*, 712 F.3d 1080, 1082 (7th Cir. 2013) (rejecting the defendant's suppression argument where GPS data was used "simply to have aided law enforcement officials in tracking down [the defendant] when they decided to effect his arrest," and not to develop a necessary link between the defendant and a crime).

Indeed, it is difficult to envision a case involving more serious intervening circumstances than presented here. Regardless of how the Deputy Marshals came upon defendant's location, once they located him, they were legally permitted—and, in fact, required—to execute the outstanding arrest warrants. *See Strieff*, 136 S. Ct. 2061-63; *United States v. Green*, 111 F.3d 515, 520-21 (7th Cir. 1997). Defendant's response to the officers' attempt to arrest him was to murder, attempt to

murder, and assault the officers (shooting Wright in the process) and then lead officers on a dangerous high-speed chase. All of these crimes provided officers with probable cause to search defendant's hotel room, electronic devices, and vehicle for evidence relating to the new crimes. Defendant has raised no challenges to the warrants that authorized these subsequent searches, and the sequence of events that transpired when officers sought to arrest the defendant sufficiently dissipated any possible taint from the challenged March 4, 2019, Warrant.

### b. *Even Absent the Challenged Pings, Defendant Inevitably Would Have Been Located at the Extended Stay Hotel.*

The inevitable discovery doctrine recognizes that "the interest in society deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred." *Nix v. Williams*, 467 U.S. 431, 443 (1984). Accordingly, evidence need not be suppressed if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id*. at 444.

In *Nix*, for example, the Supreme Court considered whether the body of a deceased victim and resulting evidence should have been suppressed because the defendant's statements identifying the location of the body were obtained in violation of the defendant's right to counsel. Id. at 437. The Court held that the exclusionary rule did not apply because the victim's body inevitably would have been found by a volunteer search that was already underway and would have carried into the area where the body was found if police had not stopped the search after the defendant led them to the location of the body. Id. at 448-50. "[W]hen . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct," the

Court explained, "there is no nexus sufficient to provide a taint and the evidence is admissible." Id. at 448.

The same logic applies here. Although the Deputy Marshals used the -9123 phone pings obtained pursuant to the March 4, 2019, Warrant to help focus their efforts to locate and arrest defendant, officers already suspected that defendant and Wright were staying at a hotel near the I-90 interchange in Rockford. And, based on the -9123 phone's historical call records, they believed the hotel to be the Extended Stay in Rockford.

Specifically, before the first ping for the -9123 phone was ever received, the BPD Supervisor had already determined that:

(i)    The -9123 phone had been using cell towers located on the east side of Rockford near the I-90 interchange from late December 2018 through the date range covered by the historical CSLI records (February 4, 2019);

(ii)   The -9123 phone had contacts with at least three Rockford area businesses during that time, specifically a Wal-Mart, an AMC Theatre, and a UPS Store, all of which were located in the area near the I-90 interchange in Rockford;

(iii)  There are a large number of hotels located near the I-90 interchange;

(iii)  The -9123 phone had twice called the 800-number for Extended Stay-brand hotels; and

(v)    The -9123 phone did not appear to have any calls with any other hotels in that area.

This information, combined with the information the Deputy Marshals gathered during their fugitive investigation of defendant, plainly indicated that the Extended Stay hotel in Rockford was the most logical location to continue their search for defendant.

The circumstances of BPD's and the Task Force's investigation, moreover, show that officers not only could have, but inevitably would have, followed the leads they had and located defendant at the Extended Stay hotel. BPD had obtained an arrest warrant for defendant after a months-long investigation into numerous residential burglaries across central Illinois. The warrant

for defendant's arrest was based on his involvement in three burglaries, but BPD had evidence connecting defendant to dozens more. A number of the burglaries involved thefts of firearms, ammunition, and precious coins or jewelry, and defendant committed the residential burglaries while on parole from prior residential burglary convictions. BPD officers were working diligently on the residential-burglaries investigation, and the Task Force was diligently pursuing available leads regarding defendant's whereabouts. In light of the serious crimes of which defendant was suspected, defendant's lengthy criminal history, the important victim considerations involved in the burglaries investigation, and the significant resources that had been devoted to the case and efforts to locate defendant, there is no question that officers would have followed up on the information indicating that defendant was likely staying at the Extended Stay hotel, even without the benefit of updated location information for the -9123 phone.

There also is little question that, once at the hotel, law enforcement officers would have learned that Wright was staying in Room 305 with a man. Indeed, hotel records show that the room was reserved under Wright's name. Thus, even a phone call to the Extended Stay hotel would have revealed that Wright had been staying at the hotel for a lengthy period and had just paid for an additional week's stay on March 7, 2019.

Just as the search efforts in *Nix* inevitably would have led to the discovery of the victim's body, law enforcement officers' efforts to find and arrest defendant inevitably would have led them to defendant's door at the Extended Stay hotel. *Nix*, 467 U.S. at 448-50; *see also United States v. Senese*, 798 Fed. App'x 499 (11th Cir. 2020) (denying motion to suppress based on the warrantless placement of a GPS device on defendant's boat because there was a reasonable probability that marine patrols would have discovered the evidence on the boat by lawful means); *United States v. Temple*, No. S1-4:15 CR 230 CR 230 1 JAR, 2017 WL 7798109, at *39-41 (E. D.

26

Mo. Oct. 6, 2017) (finding that inevitable discovery applied where officers had a valid arrest warrant for the defendant, were actively trying to locate and arrest him, and were conducting physical surveillance in the area where the defendant ultimately was found before searching for defendant with a cell site simulator); *United States v. Luna-Santillanes*, 554 Fed. App'x 402, 407 (6th Cir. 2014) (inevitable discovery applied where the officers had independent information about the location of defendant's vehicle and only used the challenged GPS device to show where the group was at a given moment).

Therefore, even if defendant's claims regarding the March 4, 2019, Warrant had merit and the court determined that the government obtained CLSI in violation of the Fourth Amendment, both the exclusionary rule would not apply based on the attenuation and inevitable discovery doctrines. *See United States v. Martin*, 807 F.3d 842, 848 (7th Cir. 2015) ("[E]ven if the police here had exhibited sufficient recklessness through their actions, we would still refrain from applying the exclusionary rule because warrantless GPS installation and subsequent tracking were authorized by our precedent."); *United States v. Anderson*, No. 08-CR-261, 2009 WL 236426, at *2 (E.D. Wis. Jan. 27, 2009) ("[T]he court finds that holding a *Franks* hearing regarding the first search warrant is unnecessary because regardless of the outcome of the *Franks* hearing, the government has demonstrated that the evidence . . . would nonetheless have been inevitably discovered.").

For these reasons, defendant cannot establish that he suffered any prejudice based on his attorney's failure to file a suppression motion to challenge CLSI evidence in this case.

## IV.     CONCLUSION

For the reasons explained above, the government respectfully requests that the Court deny defendant's § 2255 motion.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney

BY:  _/s/ Ronald DeWald_
RONALD DEWALD
Assistant United States Attorney
327 South Church Street, Suite 3300
Rockford, Illinois 61101
(815) 987-4444

## CERTIFICATE OF SERVICE

I, RONALD DEWALD, hereby certify that, on December 13, 2023, in accordance with

FED. R. CRIM. P. 49, FED. R. CIV. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing

(ECF), the following document:

### GOVERNMENT'S RESPONSE TO DEFENDANT'S § 2255 MOTION

was served pursuant to the district court's ECF system as to ECF filers, and was sent by first-class

mail to the following non-ECF filer[3]:

Floyd Brown
Federal Bureau of Prisons Inmate #K70014
McLean County Jail
104 W. Front Street
Bloomington, IL 61701

  /s/ Ronald DeWald
RONALD DEWALD
Assistant United States Attorney
327 South Church Street, Suite 3300
Rockford, Illinois 61101
(815) 987-4444

---

[3] Defendant was assigned to USP McCreary in Kentucky, but informed the court in prior filings that he was transferred to Mclean County, Illinois, for temporary custody through the Interstate Agreement on Detainers Act and that any mail pertaining to this case be sent to him at the Mclean County Jail. R.4 and 6.