**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 23 C 50312 |
| | ) | |
| FLOYD BROWN, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

On April 8, 2022, after a two-week trial, a jury found Floyd Brown guilty of second-degree murder of a federal officer under 18 U.S.C. §§ 1111 and 1114(1) and various other related charges in the superseding indictment against him. On August 29, 2022, the Court sentenced Brown to a prison term of fifty-five years, followed by a five-year term of supervised release. Brown did not appeal his conviction or sentence. On August 28, 2023, Brown filed a *pro se* motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. He argues that his trial counsel's failure to file a motion to suppress evidence amounted to ineffective assistance of counsel. For the following reasons, the Court denies Brown's motion.

**Background**

The background of this case dates back to December 2018, when the Bloomington, Illinois Police Department (BPD) was investigating a series of residential burglaries. On December 23, 2018, BPD officers found Brown, whom they had

identified as their prime suspect, allegedly in the midst of another residential burglary. Brown fled from the scene before BPD could arrest him.

On or about December 26, 2018, a McLean County Circuit Court judge issued an arrest warrant for Brown on charges arising from three residential burglaries in Bloomington. Five days later, the Illinois Department of Corrections also issued an arrest warrant for Brown for violating the terms of his parole. Shortly after these arrest warrants were issued, deputy U.S. marshals with the Great Lakes Regional Task Force began working with local law enforcement to locate and detain Brown.

In January 2019, deputy marshals interviewed Brown's former girlfriend (Individual A) for information on his whereabouts. Individual A informed them that she and Brown were no longer in a relationship and that Brown had a new girlfriend, whom she identified as "Dri." Individual A also identified a Facebook profile that she said was used by "Dri," and she said that Brown and "Dri" were likely together. Law enforcement subsequently identified "Dri" as Drianna Wright "based on a comparison of known photographs of Wright with photographs posted on 'Dri's' Facebook account." Gov't's Resp. to Def.'s § 2255 Mot. at 3.

Deputy marshals also searched for Brown at his son's residence in early January 2019. While there, they questioned the son about Brown's whereabouts and were "advised that [Brown] and Wright had previously been staying with him and his girlfriend, but that [Brown] and Wright had not been there in weeks." *Id.*

Based on this information, law enforcement expanded its search to include Wright. On or about January 18, 2019, deputy marshals received information from Amtrak that Wright had booked a bus trip from Rockford to Chicago, followed by a train

trip from Chicago to Springfield, for January 17, 2019 and a return trip for January 18, 2019. Records indicated, however, that Wright had not boarded the bus or the train. Amtrak also provided the phone number and e-mail address used for the booking. This phone number was 314-xxx-9123 (the -9123 phone).

On February 5, 2019, law enforcement obtained from a McLean County judge a search warrant for "historical call, text, and data detail records and historical location information for the -9123 phone." *Id.* Utilizing historical cell site location information (CSLI) obtained via this warrant, law enforcement learned that the -9123 phone had been pinging off cell towers located on the east side of Rockford. Call records from the phone indicated calls made to a bus company, Amtrak, and multiple Rockford businesses. Notably, the records showed two calls made to an 800-number for the hotel brand Extended Stay America. The call records did not indicate that any other hotels were contacted. These findings were compiled and discussed by law enforcement on March 4, 2019.

On March 4, 2019, a McLean County judge issued a search warrant for "the installation, use, and monitoring of a pen register and trap and trace device and the obtaining of historical and prospective location information for the -9123 phone." *Id.* at 4–5. Law enforcement served the phone service provider with the warrant on March 5 and began receiving real-time location information and pen register and trap and trace data around 7:00 p.m. that same evening. This information was consistent with location information obtained from the February warrant; pings for the -9123 phone indicated that it was located on the east side of Rockford near the I-90 interchange. Based on the information obtained from the two warrants, law enforcement planned to search for

Brown at the Extended Stay America hotel in Rockford on the morning of March 7 "assuming that overnight ping data did not point in another direction." *Id.* at 5.

On the morning of March 7, 2019, updated information from the -9123 phone showed that it was still in the same area as the night before. Law enforcement traveled to Rockford and, in particular, to the Extended Stay America hotel there. Once they arrived at the hotel, law enforcement spoke with the hotel's general manager at the front desk. The hotel maintenance engineer joined the conversation, and both he and the general manager identified Wright, based on photographs, as a guest staying in Room 305. The hotel manager stated that "Wright had come to the front desk a few minutes earlier to pay for an additional week." *Id.* at 6. The hotel manager also told law enforcement that Wright had been staying at the hotel since December 2018 and that a male was staying with her. The maintenance engineer described a car he believed belonged to Wright and the unknown male, and he told law enforcement where the car was typically parked in the hotel's parking lot.

At approximately 8:40 a.m., law enforcement mobilized to secure the area. *See* Def.'s Reply to Gov't's Resp. to § 2255 Mot., Ex. H-7 at 3 (FBI interview of Deputy U.S. Marshal Michael Flannery). Officers set up exterior surveillance positions surrounding the hotel, including placing an officer near the vehicle identified by the maintenance engineer as belonging to Wright. At the same time, the maintenance engineer "agreed to conduct a ruse visit to Room 305 to determine whether the male was in the room at the time." Gov't's Resp. to Def.'s § 2255 Mot. at 6. As part of this ruse visit, the maintenance engineer knocked on Room 305, and Wright allowed him to enter. The maintenance engineer exited the room and confirmed to law enforcement that "a male

4

was lying on the bed" but stated that he could not see the man's face to positively identify whether he was Floyd Brown. *Id.*

Deputy marshals then prepared to enter Room 305 and arrest Brown. Three deputy marshals approached the room with a battering ram, knocked, and announced themselves as U.S. Marshals with a warrant for Brown's arrest. A deputy marshal used a master key obtained from the hotel manager to open the door. The door did not open fully because the swing lock was engaged. But before any further steps could be taken, Brown began firing a gun at officers from inside the hotel room. Brown fired multiple shots before jumping out the hotel room's third-story window toward the parking lot. As Brown fled through the parking lot, he shot and killed Special Deputy Marshal Jacob Keltner, "who had been occupying an exterior surveillance position near the hotel's northeast side between Room 305 and defendant's vehicle." *Id.* at 7. Brown then left the scene in his vehicle.

Just before 11:00 a.m., Illinois State Police spotted Brown on highway I-39. A high-speed chase ensued, ending with Brown crashing his car in a field and engaging in an hours-long stand-off with law enforcement. Eventually, Brown surrendered and was taken into custody.

As Brown was being pursued and apprehended, law enforcement was working to secure the scene at the Extended Stay hotel. During the initial shooting, a round fired by Brown had struck Wright, who was standing near the hotel room door at the time. Wright indicated to law enforcement that she had been shot, and emergency services were called to the scene.

According to Brown, law enforcement made three entries into the hotel room

5

after the initial entry.  First, they entered to render aid to Wright and evacuate her from the room.  Second, they entered to conduct a protective sweep, which involved opening the closet.  Third, law enforcement entered the room and recovered various items that they had seen during the protective sweep.  Based on officers' reports, the first two entries occurred more or less simultaneously; according to Rockford police officer Joseph Stevens, a SWAT team entered the room first to extract Wright, and he then "entered the room behind the SWAT team."  Def.'s Reply to Gov't's Resp. to § 2255 Mot., Ex. H-11 at 5; *see also id.*, Ex. H-9 at 2 (Rockford Police Department report of officer Robert Reffett stating that "[t]he Illinois State Police SWAT team breached the door to the suspects [sic] room and removed the female," then they "cleared the suspects [sic] room and determined nobody else was inside.").  During the protective sweep, Stevens says, he saw spent shell casings on the floor, drops of blood, a laptop computer, and "numerous items laying [sic] in the closet."  *Id.*, Ex. H-11 at 5.  Though the exact time of these first two entries is not stated in police reports, Stevens' report indicates that he remained in Room 305 to secure the room until he was relieved by other officers at 11:30 a.m.  *Id.*, Ex. H-11 at 5–6.

At approximately 6:20 p.m. on March 7, a federal magistrate judge issued a warrant to search Rooms 305, 306, and 307, as well as the common areas of the Extended Stay hotel.  Law enforcement recovered the following evidence from Room 305:  "two loaded handguns with obliterated serial numbers, several loaded firearm magazines, hundreds of rounds of ammunition, a ballistic vest, and three electronic devices, namely, defendant's cell phone, computer, and PlayStation console."  *Id.* at 7– 8.  A search pursuant to a subsequent warrant authorizing law enforcement to search

6

the three electronic devices uncovered "additional evidence relating to, among other things, defendant's knowledge, intent, planning and premeditation, and possession of the weapons." *Id.* at 8. A search of the cell phone recovered at the scene confirmed it was assigned the -9123 phone number that had initially led law enforcement to the Extended Stay hotel.

On March 8, law enforcement obtained a warrant to search Brown's vehicle. Officers recovered "two rifles with obliterated serial numbers, one of which was later connected to spent shell casings found at the Extended Stay hotel, and nearly 1,000 rounds of additional ammunition." *Id.*

A grand jury indicted Brown on multiple charges, including first-degree murder in violation of 18 U.S.C. §§ 1114(1) and 1111. Through counsel, he filed several pre-trial motions, including a motion seeking a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), to challenge the veracity of facts used to support the March 4, 2019 search warrant. This Court denied Brown's motion for a *Franks* hearing, finding that he failed to show any of the challenged statements were materially false. The Court alternatively ruled, among other things, that Brown's commission of a new offense—the March 7 shooting and homicide—was an intervening circumstance that dissipated any taint of illegality that might be claimed to arise from allegedly false statements in the warrant application.

Brown's jury trial began on March 28, 2022, and on April 8, 2022, the jury returned a verdict finding him guilty of second-degree murder and the other charges in the superseding indictment—aside from first-degree murder, on which the jury acquitted Brown. On August 9, 2022, the Court denied Brown's motion for a new trial and, on

7

August 29, the Court sentenced him to a prison term of fifty-five years. On September 6, 2022, this Court entered the judgment of conviction against Brown. Brown did not appeal his conviction or sentence.

On August 28, 2023, Brown filed the present motion under 28 U.S.C. § 2255. In his motion, Brown contends that he received ineffective assistance of counsel because his attorneys failed to file a motion to suppress evidence that he contends was obtained from the tracking of his cellular phone. In his reply brief, Brown appears to separately contend that law enforcement's entry into and search(es) of the Extended Stay hotel room after the shooting violated the Fourth Amendment and that law enforcement violated Illinois law in obtaining cell site location information. *See* Def.'s Reply to Gov't's Resp. at 6–11. Brown appears to be adding these contentions to his claim of ineffective assistance involving counsel's failure to file a motion to suppress, though it is also possible that he is challenging the entry and search(es) directly, not filtered through an ineffective assistance claim.[1]

## Discussion

A court may grant relief from a federal sentence under 28 U.S.C. § 2255 if "the sentence was imposed in violation of the Constitution or laws of the United States,"

---

[1] If Brown is challenging the searches directly, rather than through his ineffective assistance of counsel claim, any such challenge is barred as untimely. An issue is waived if it could have been raised in an opening brief but was not. *See Qualls v. United States*, 774 F.2d 850, 851 (7th Cir. 1985) ("[P]etitioner did not raise this issue before the district court in either petition for section 2255 relief. Accordingly, defendant has waived the issue for appeal."); *Bourgeois v. Watson*, 977 F.3d 620, 629–31 (7th Cir. 2020) (analyzing issue of waiver in the context of a petition for section 2255 relief); *see also Wood v. Milyard*, 566 U.S. 463, 474 (2012) (applying the waiver doctrine in the context of a state prisoner's habeas corpus petition); *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003) (collecting cases regarding waiver in the context of summary judgment).

among other reasons.  28 U.S.C. § 2255.  Generally, claims not brought on direct appeal may not be raised for the first time on collateral review "unless the petitioner shows cause and prejudice."  *Massaro v. United States*, 538 U.S. 500, 504 (2003). Claims for ineffective assistance of counsel, however, "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal."  *Id.*

A.      **Ineffective assistance of counsel**

The Sixth Amendment guarantees the right to counsel in all criminal proceedings "in order to protect the fundamental right to a fair trial."  *Strickland v. Washington*, 466 U.S. 668, 684 (1984).  Included in the right to counsel "is the right to the effective assistance of counsel."  *Id.* at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n.14 (1970)).  To successfully maintain an ineffective assistance of counsel claim, a criminal defendant must show two things:  (1) "that counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense."  *Id.* at 687. Failure to establish either element defeats a movant's claim.  *See Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020).

When a defendant premises an ineffective assistance of counsel claim on defense counsel's failure to litigate a Fourth Amendment claim competently, to establish prejudice the movant "must . . . prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence . . . ."  *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986).  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  The movant is not required to show that

9

counsel's conduct "more likely than not altered the outcome in the case," *id.* at 693, but the "likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

The Court will begin by addressing whether the motion to suppress that Brown contends his counsel should have filed would have been meritorious such that the outcome of his trial would have been different. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.").

### 1.    Prejudice from failure to file motion to suppress

Brown's contentions in his section 2255 motion regarding violations of the Fourth Amendment (and counsel's ineffectiveness for failure to challenge those violations) are not crystal clear, but he appears to argue that:  (1) there actually was no warrant issued on March 4; (2) even if there was a warrant, law enforcement obtained and used information predating the warrant, and this was improper; and (perhaps) (3) the warrant did not authorize law enforcement to obtain the information that it used to locate him at the Extended Stay hotel.  *See* Def.'s § 2255 Mot. at 22.

The Court will address all of those points, but it begins in another place.  Brown's foundational contention is that the government did not properly obtain the geolocation evidence that it used to find him at the Extended Stay hotel.  The problem with this is that a motion seeking to suppress evidence on that basis would not have gotten Brown anywhere.  The government did not offer any geolocation information at trial.  It didn't need to.  The story for purposes of the trial effectively started *once Brown had been*

*located at the hotel*, not before.  Thus there was no need for the government to introduce the geolocation information.  And as indicated, it did not introduce any such information.

What the government found via the geolocation evidence was Brown himself. But even if law enforcement came about Brown's location improperly, he would not have been entitled to suppression of his identity, or his body.  He cites no law suggesting this, and in fact the law is exactly to the contrary.  "The body or identity of a defendant . . . is never itself suppressible as a fruit of an unlawful arrest, even if it conceded that an unlawful arrest, search, or interrogation occurred."  *United States v. Chagoya-Morales*, 859 F.3d 411, 415 (7th Cir. 2017) (quoting *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984)).

Brown appears to contend that all of the information that law enforcement recovered from his hotel room (and perhaps elsewhere) after it located him there constituted fruits of the poisonous tree that should have been suppressed if the March 4 warrant was not properly issued.  If that is Brown's contention, it is incorrect.  The crimes that Brown committed when law enforcement encountered him at the Extended Stay hotel amounted to intervening circumstances that broke any causal connection between the March 4 warrant and the information seized after the shooting took place. *See United States v. Sprinkle*, 106 F.3d 613, 619 (4th Cir. 1997); *id.* at 619 n.4 (collecting cases).  The Court so ruled, in fact, in connection with a separate motion that trial counsel *did* file, in which they sought a *Franks* hearing regarding the issuance of the March 4 warrant.

For these reasons, a motion to suppress the fruits of the March 4 warrant would

have gotten Brown nowhere.  He therefore suffered no cognizable prejudice from trial counsel's failure to file the motion.  As a result, his claim of ineffective assistance of counsel fails.

The Court will nonetheless address the other contentions that Brown makes regarding the warrant to ensure a complete record in the event of an appeal.

Brown appears to contend that if his attorneys had filed a motion to suppress, "the Court would have heard evidence that there wasn't a warrant authorizing the use of geofencing/geotracking and, that there was [sic] warrantless searches to Room 305." Def.'s Reply to Gov't's Resp. to § 2255 Mot. at 1.  More specifically, Brown says that:

> No warrant authorized law enforcement to use geofencing/geotracking to ping Mr. Brown's cell phone to reveal his location.  As a result, law enforcement obtained Mr. Brown's GPS location as early as March 1, 2019[,] in violation of his Fourth Amendment rights, and all the evidence obtained as a result of that illegal search and seizure, including evidence obtained through the search warrants for Mr. Brown's hotel room and car is fruit of the poisonous tree, and should be suppressed.

Def.'s § 2255 Mot. at 37.  Brown says that, when reviewing the electronic tracking data used to locate him in Rockford, he found maps that he believes show that law enforcement used geofencing to track his cell phone's location.  *See id.*, Exs. A–B. According to Brown, the warrants did not permit geofencing.  Brown also contends that law enforcement used location data from prior to March 4, 2019, the date the warrant was obtained.  Based on these contentions, Brown argues that the resulting search(es) of his hotel room was illegal and that all evidence obtained from the hotel room should be suppressed.

Brown's characterizations of the March 4, 2019 search warrant and the methods law enforcement used to locate him in Rockford are not supported by the record.

Starting with the March 4 warrant, it authorized law enforcement to collect, among other things, the following information:

> Cell site activations; . . . [w]ire, electronic, cellular data, and all other dialing, routing, addressing and signaling information initiated from and received by the [-9123 phone], but not including the content of any communications; . . . [and] twenty-four hour a day assistance to include switch based solutions including precision location based information queries, per-call measurement data (PCMD), range-to-tower (RTT), Network Event Location System/NELOS, GPS/E911, and all reasonable assistance to permit the aforementioned agencies to triangulate the historic, current, and ongoing/prospective/real-time location of the target telephone.

Application/Warrant at 4, *United States v. Brown*, No. 19-cr-50016 (N.D. Ill. June 15, 2021), ECF No. 175-1.  The March 4 warrant applied to the above information "for the period of sixty (60) days *prior* continuing through sixty (60) days from the date of this Order."  *Id.* (emphasis added).  In short, the plain language of the warrant:  (a) authorized law enforcement to use geotracking to locate Brown's phone going forward from March 4, 2019; *and* (b) permitted the collection of historic cell site location information, going back sixty days—in other words back to January 3, 2019.
For these reasons, Brown is incorrect that law enforcement exceeded the scope of the warrant to locate him in Rockford.

As the search warrant specifically permitted, law enforcement obtained information that tracked the cell site activation of Brown's phone, and then it mapped out the radius of the two cell towers on which his phone had recently pinged, and inferred that Brown was likely in the area where the two radii overlapped because the hotel that the -9123 phone called—the Extended Stay America—was also in that same area.  In sum, law enforcement did not obtain anything that the warrant did not permit it to obtain.

Brown also appears to contend that a hearing on a motion to suppress would

have brought to light evidence that the March 4 warrant did not actually exist at the time law enforcement began to track the -9123 phone. To support this contention, Brown points to statements made by various law enforcement officials before the March 7 entry into his hotel room. One such e-mail, sent on March 5 at 9:28 a.m. from BPD officer Tom Rena, states that "[a]ttached is the phone number that Drianna Wright gave to AMTRAK. There are several calls that makes [sic] me believe that she is using this phone." Def.'s § 2255 Mot., Ex. G. Rena then asks, "Can we go up on it?" *Id.* In response to that e-mail, Deputy Marshal Craig Kmett sent an e-mail to Deputy Marshal Frederick Freeman on March 5 at 10:47 a.m. stating that "[t]hey think they have a good # for Floyd Brown's girlfriend. Everyone interviewed says Floyd and her are together in the Rockford area." *Id.* Kmett then asks, "Let me know if they can get Order on her phone (Verizon)." *Id.*

Brown contends that these statements indicate that law enforcement did not actually have a warrant as of March 5. Specifically, he contends that Rena asking "[c]an we go up on it" and Kmett's subsequent request to "[l]et me know if they can get Order on her phone" "would lead a reasonable person to believe that there was no warrant for the -9123 phone as of March 5, 2019." *Id.* at 27. That's a *non sequitur*. There are all sorts of better explanations for this that are consistent with the warrant actually having been issued on March 4, the date that it bears on its face. Perhaps the simplest is that the officers who wrote these emails were not completely in the loop. The Court also notes that, as indicated earlier, even though the warrant was signed and issued on March 4, it was not served on the cell phone service provider until March 5, the same date as the two emails, and law enforcement did not start getting data until

14

7:00 p.m. that evening.  Viewed in this context, the emails that Brown cites are not evidence of a rogue operation to obtain cell site location information without a warrant; rather, they represent human participants catching up with the unfolding events.

In sum, any contention by defense counsel that there was no warrant at the relevant time would have been meritless.

Brown also contends that law enforcement used cell site information *predating* the March 4 warrant and that this is further evidence of an illegal search.  Again, not so.  As the Court has discussed, the March 4 warrant enabled law enforcement to get both historical information (going back in time) and real-time information (going forward in time).

For all of these reasons, any motion filed by counsel arguing that the location data obtained by law enforcement was the product of an unconstitutional search would have failed.  In *Carpenter v. United States*, 585 U.S. 296 (2018), the Supreme Court held that "the Government must generally obtain a warrant supported by probable cause before acquiring [historical CSLI]."  *Id.* at 316.  In Brown's case, the government did that:  the warrant was properly supported, and it plainly authorized law enforcement to obtain information going back sixty days and going forward sixty days.  As such, Brown's Fourth Amendment rights were not violated when law enforcement obtained and used cell site location information to find him.

The Court also notes that under controlling Seventh Circuit authority, the obtaining of real-time location data to locate Brown did not constitute a search within the meaning of the Fourth Amendment.  *See United States v. Hammond*, 996 F.3d 374, 387 (7th Cir. 2021).  In *Hammond*, the Seventh Circuit found that use of real-time location

data for a limited period of time is not a search when the location data "does not provide a 'window into [the] persons' life, revealing . . . his familial, political, professional, religious, and sexual associations' to the same, intrusive degree as the collection of historical CSLI." *Id.* at 389 (quoting *Carpenter*, 585 U.S. at 311). In the present case, law enforcement tracked Brown's real-time CSLI for "approximately 38 hours: from around 7:00 p.m. on March 5, 2019, until the morning of March 7, 2019." Gov't's Resp. to Def.'s § 2255 Mot. at 18. Further, the pings used to track Brown's real-time movements provided only a general location, as each cell tower's location radius ranged from about 0.8 miles to about 1.5 miles. As such, the pings were not precise enough to show Brown's movements within a private space. *See United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) (finding that using "seven hours of GPS location data to determine an individual's location (or a cell phone's location) so long as the tracking does not reveal movements within the home (or hotel room), does not cross the sacred threshold of the home, and thus cannot amount to a Fourth Amendment search"). In short, the privacy interest at the core of the Supreme Court's analysis in *Carpenter* has no bearing here; rather, *Hammond* indicates that law enforcement's use of Brown's real-time CSLI to locate him in Rockford did not amount to a search under the Fourth Amendment.

To sum up: even if use of real-time CSLI did constitute a search under the Fourth Amendment, law enforcement had a properly-obtained warrant allowing it to gather that information. Brown's contention that his Fourth Amendment rights were violated when law enforcement used both historical and real-time location data to locate him in Rockford is not persuasive. Any motion to suppress evidence stemming from the

16

March 4 warrant would have lacked merit. Thus Brown cannot establish that he was prejudiced by counsel's claimed ineffective assistance in failing to file such a motion. As a result, his ineffective assistance claim fails.

### 2. Entries into the Extended Stay America hotel room

In his reply brief, Brown contends that a motion to suppress would have brought to light facts regarding what he contends were illegal entries by law enforcement into the Extended Stay hotel room. This contention is waived, or forfeited, as Brown did not raise it in his section 2255 motion. *See Qualls*, 774 F.2d at 851; *Palmer*, 327 F.3d at 597–98. The Court nonetheless considers the point to ensure a complete record in the event of an appeal.

As indicated earlier, law enforcement obtained a master key from the hotel's general manager and used it to open the door to Brown's hotel room. Though law enforcement had a warrant to arrest Brown, there was no search warrant for the hotel room. Brown argues that the entry or entries into his hotel room without a warrant ran afoul of the Fourth Amendment. Thus, he contends, all evidence obtained from the hotel room should have been suppressed. Accordingly, Brown argues that, by not filing a motion to suppress based on these illegal entries, his counsel provided ineffective assistance.

To support this position, Brown cites to *Steagald v. United States*, 451 U.S. 204 (1981). In *Steagald*, the Supreme Court addressed "whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." 451 U.S. at 205. The Court in *Steagald* held that law enforcement must obtain a search warrant

17

to effectuate an arrest—even an arrest supported by a valid warrant—if that arrest involves entering the home of a third party. *Id.* at 205–06. Further, the Fourth Amendment extends beyond the home to include hotel rooms. *See Stoner v. California*, 376 U.S. 483, 490 (1964) ("No less than a tenant of a house, or the occupant of a room in a boarding house, . . . a guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures." (internal citation omitted)). Brown contends that he had a legitimate expectation of privacy in Room 305 and that, based on *Steagald*, officers could not "enter [the] hotel room to arrest an occupant that is the subject of an arrest warrant"—i.e., Brown himself—because they did not also have a search warrant for that hotel room. *See* Def.'s Reply to Gov't's Resp. to § 2255 Mot. at 8.

This argument lacks merit. First and foremost, Brown's reliance on *Steagald* is not persuasive. We are not talking here about the search of a third party's home (or hotel room), as was the case in *Steagald*; Brown asserts that Room 305 was *his* hotel room. *See id.* at 7–8. For this reason, *Steagald* is inapposite. In *Steagald*, police officers entered Gary Steagald's home to execute an arrest warrant for Richard Lyons. *Steagald*, 451 U.S. at 206. During an unsuccessful search for Lyons in Steagald's home, officers discovered contraband, which led them to obtain a search warrant for Steagald's home and, ultimately, file criminal drug charges against Steagald. *Id.* at 206–07. Steagald challenged law enforcement's initial entry into his home without a search warrant. The Supreme Court concluded that although law enforcement's arrest warrant for Lyons permitted them to "arrest Lyons in a public place or in *his* home," *id.* at 213 (emphasis added), it did not permit them to arrest Lyons in *Steagald's* home.

This case is different. Brown was not arrested in someone else's home (or hotel room); as indicated, he says it was *his* hotel room. Thus what happened here is that law enforcement, armed with a warrant for Brown's arrest, entered *his* "home" to arrest him. That did not run afoul of *Steagald*, and it did not violate the Fourth Amendment. The arrest warrant for Brown permitted entry into his home (here, his hotel room) to arrest him, at least if there was probable cause to believe he was there—as there quite plainly was. A separate search warrant was not needed to enter Brown's hotel room. *See Payton v. New York*, 445 U.S. 573, 602–03 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.").

Were Brown now to switch gears and suggest that it was not his hotel room and that he was merely Wright's guest, that would not improve his chances. Though that scenario might make *Steagald* applicable, the person in *Steagald* whose Fourth Amendment rights were violated was Steagald, the home's owner, not Lyons, the assumed guest. "[O]ne who seeks to challenge the legality of a search as the basis for suppressing relevant evidence [is required to allege] . . . that he himself was the victim of an invasion of privacy." *Jones v. United States*, 362 U.S. 257, 261 (1960). Thus if the hotel room was Wright's, it was her Fourth Amendment rights, not Brown's, that were implicated by law enforcement's entry. This is beside the point, however, as Brown repeatedly states that law enforcement violated his Fourth Amendment rights when they entered *his* hotel room.

This covers law enforcement's initial entry into the hotel room. Brown—again,

19

only in his reply—also challenges later entries to the room in which evidence was seen and ultimately seized. This argument is forfeited or waived for the same reasons previously discussed. That aside, any such contention by his counsel would have failed, for two reasons.

The first is one the Court has already referenced, specifically, the attenuation doctrine. "Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Utah v. Strieff*, 579 U.S. 232, 238 (2016) (citation and quotation marks omitted). Courts consider three factors to determine whether evidence has become attenuated from the constitutional violation such that it may be admissible: (1) the "temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional search"; (2) "the presence of intervening circumstances"; and (3) "the purpose and flagrancy of the official misconduct." *Id.* at 239.

In this case, as the Court has stated (and as it ruled in connection with trial counsel's *Franks* motion), the attenuation doctrine applies. The temporal proximity factor does not cut in favor of attenuation "unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Id.* (citation omitted). Here, not much time passed between law enforcement's initial entry and the seizure of evidence from Room 305.

But although the time differential is relatively short, there were significant

intervening circumstances, which would weigh strongly against suppressing evidence obtained from the hotel room:  Brown's shooting at the deputy marshals and his flight from the scene.  *See Sprinkle*, 106 F.3d at 619 (finding that a defendant's "own illegal acts after the initial [constitutional violation] trigger[s] an exception to the exclusionary rule" because the defendant's response "is itself a new, distinct crime" (citation and quotation marks omitted)).  In addition, based on Brown's conduct of shooting at officers and then fleeing from the scene—a shooting which resulted in the death of officer Keltner—law enforcement obtained a warrant to search Room 305.  "[T]he existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is sufficiently attenuated to dissipate the taint."  *Strieff*, 579 U.S. at 240.  Therefore, the second factor favors the government.

Finally, there is nothing approaching "flagrant" misconduct here.  Even if one assumes—contrary to the Court's conclusion—that the first entry into the room was improper, the second and third entries were fully and independently justified.  When law enforcement entered the hotel room to remove Wright, that was fully permissible (irrespective of any justification for the initial entry) based on exigent circumstances.  *See Hammond*, 996 F.3d at 384 ("One well-recognized exception [to the search warrant requirement] applies when 'the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.'" (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)).  Specifically, the need for emergency aid for Wright, an injured occupant of the room, amounted to an exigent circumstance that permitted entry without a warrant.  *See King*, 563 U.S. at 460.  And when law enforcement then reentered the room (or expanded the

scope of its initial entry), that was a justified "protective sweep"—"a quick and limited search of the premises, incident to an arrest," in order to conduct "a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

Brown does not challenge the proposition that exigent circumstances existed allowing law enforcement to enter the hotel room without a warrant to remove Wright and conduct a protective sweep. Rather, he argues only that "the third entry into the room by Rockford Police was illegal and thus, violated the defendant's Fourth Amendment rights." Def.'s Reply to Gov't's Resp. to § 2255 Mot. at 10. This argument fails. Brown concedes that "the items [in the hotel room] were finally seized pursuant to a warrant." *Id.* at 11. Law enforcement initially identified the items later recovered from the hotel room because they were in plain view during the protective sweep. "The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes" and ignore evidence in plain view. *California v. Ciraolo*, 476 U.S. 207, 213 (1986). And law enforcement did not simply take the items then; rather it obtained a search warrant allowing their seizure.

For these reasons, Brown has identified no viable basis for suppression of any material that was seized from the hotel room. Any motion to suppress would have lacked merit.

### 3. Claimed "seizure" of cell phone

As a final matter, Brown contends that law enforcement illegally seized his phone when it "commandeered [his] cell phone to reveal his GPS location." Def.'s § 2255 Mot. at 36. According to Brown, "[l]aw enforcement thus converted [his] cell phone into a

tracking device, much like the tracking device in [*United States v. Jones*], by trespassing onto his cell phone."  *Id.*  This argument is unpersuasive for several reasons, the most obvious being that in *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court based its holding on the fact that "[t]he Government *physically* occupied private property for the purpose of obtaining information."  *Id.* at 404 (emphasis added).  The Court in *Jones* noted the history of Fourth Amendment jurisprudence, relying on principles based in common law trespass, when it found that there would be "no doubt that such a *physical* intrusion would have been considered a 'search' within the meaning of the Fourth Amendment."  *Id.* at 404–05 (emphasis added) (citation omitted).  The Court explained that "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates."  *Id.* at 406.  Accordingly, the fact that law enforcement physically attached a tracking device to Jones's car—one of his effects—was central to the Court's finding that a search had occurred.  *Id.* at 404 ("It is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment.").  The Court in *Jones* expressly did not consider the argument raised by Brown:  "It may be that [tracking a suspect's movement for an extended period of time] through electronic means, without an accompanying trespass, is an unconstitutional invasion of privacy, but the present case does not require us to answer that question."  *Id.* at 412.

Brown's argument that law enforcement seized his cell phone when it began tracking his CSLI data is unpersuasive for another reason:  it did not meaningfully interfere with Brown's possessory interest in his cell phone.  *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  Brown does not contend that he was unable to

use his cell phone or that law enforcement otherwise limited the cell phone's functionality. Accordingly, the Court finds that law enforcement did not seize Brown's phone within the meaning of the Fourth Amendment when it used CLSI data from the phone to track and locate Brown in Rockford.

In sum, Brown has failed to show that any motion to suppress evidence based on alleged Fourth Amendment violations would have had a reasonable chance of succeeding. Therefore, it is unnecessary to determine whether his lawyers' failure to file such a motion fell below an objective standard of reasonableness. *See Dunn*, 981 F.3d at 591.

## B.    State law claim

In his reply, Brown contends for the first time that the government violated Illinois state law when it sought location information for the -9123 phone. According to Brown, law enforcement was under the belief that the -9123 phone belonged to Wright at the time it applied for the search warrant. Brown contends that law enforcement violated the Illinois Freedom from Location Surveillance Act, 725 ILCS 168/10, by obtaining location information for the -9123 phone. This provision states, in relevant part:

> [A] law enforcement agency shall not obtain location information pertaining to a person or his or her effects without first obtaining a court order . . . based on probable cause to believe that the person whose location information is sought has committed, is committing, or is about to commit a crime or the effect if evidence of a crime, or if the location information is authorized under an arrest warrant . . . to aid in the apprehension or the arrest of the person named in the arrest warrant.

725 ILCS 168/10. According to Brown, police did not have probable cause to believe that Wright—who, based on the information from Amtrak, appeared to be the registered owner of the -9123 phone—was suspected of committing any crime or that the phone

24

was evidence of a crime. As noted, Brown makes this claim for the first time in his reply. Therefore, the Court finds that Brown has waived the claim. *See Palmer*, 327 F.3d at 597–98 (collecting cases).

Waiver aside, a state-law violation would not entitle Brown to relief under section 2255 in any event. Section 2255, by its terms, requires a showing that the defendant's conviction was procured or his sentence was imposed "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a); *see also United States v. Addonizio*, 442 U.S. 178, 186 (finding that a motion brought under section 2255 must allege either a constitutional violation, that the sentence imposed was beyond the statutory limit, or that the proceeding was infected in an "error of fact or law of the 'fundamental' character that renders the entire proceeding irregular and invalid"). Brown's contention that law enforcement allegedly violated an Illinois statute is not cognizable under section 2255.

## Conclusion

For the reasons stated above, the Court denies Brown's motion under 28 U.S.C. § 2255 [dkt. 1]. Brown's earlier-filed motions for extension of time were ruled upon and are terminated as moot [dkt. 21, 22]. The Clerk is directed to enter judgment stating: Floyd Brown's motion under 28 U.S.C. § 2255 is denied. The Court also declines to issue a certificate of appealability, as the Court can find nothing to suggest that the merits of the claims that were rejected are debatable, capable of different resolution, or deserving of further consideration. *See* 28 U.S.C. § 2253(c)(2); *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983); *Porter v. Gramley*, 121 F.3d 1308, 1312 (7th Cir. 1997).

Date: July 15, 2025

_____
MATTHEW F. KENNELLY
United States District Judge